UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

SHARON KELLY,

        Plaintiff,

   -against-

NEW YORK STATE OFFICE OF MENTAL
HEALTH and NEW YORK CITY CHILDREN'S
CENTER (FORMERLY KNOWN AS BROOKLYN
CHILDREN'S CENTER),

        Defendants.

----------------------------------X

**MEMORANDUM & ORDER**

13-CV-3383 (KAM)(SLT)

**MATSUMOTO, United States District Judge:**

      Plaintiff Sharon Kelly, a registered nurse proceeding *pro se*, commenced this action against her former employers the New York State Office of Mental Health ("OMH") and the Brooklyn Children's Center ("BCC") (collectively, "defendants")[1] asserting that defendants discriminated against her on the basis of her disability in violation of the Rehabilitation Act of 1973 (the "Rehabilitation Act" or the "Act"), 29 U.S.C. § 701 *et seq.* She also alleges that she was retaliated against for exercising her

---

[1] Plaintiff originally brought claims also against the New York State Office for People with Developmental Disabilities, but the parties have since stipulated to the dismissal of that defendant. (ECF No. 17.) Additionally, although the parties previously also stipulated to the dismissal of OMH (*id.*), OMH was reinstated as a defendant on July 9, 2015. (Docket Entry 7/9/2015.) Finally, BCC has since been renamed the New York City Children's Center. (*Id.*) For clarity, and consistent with plaintiff's usage of the prior name, the court will use the term BCC.

rights under the Rehabilitation Act. Defendants have moved to dismiss the Second Amended Complaint (ECF No. 52, Second Amended Complaint ("Compl.")) for failure to state a claim. For the reasons set forth herein, defendants' motion to dismiss is GRANTED.

**BACKGROUND**

## I.   *Factual Background*

The following facts derive principally from the Second Amended Complaint and are presumed true for purposes of resolving defendants' motion to dismiss. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Despite defendants' characterization of their motion pursuant to Fed. R. Civ. P. 12(b)(6), the court also occasionally cites to plaintiff's opposition affirmation (ECF No. 60, Plaintiff's Affirmation in Opposition to Motion to Dismiss ("Pl. Opp'n")) in detailing the factual background to this action because the Second Amended Complaint is occasionally difficult to comprehend. *See Jackson v. Elmhurst Hosp. Ctr.*, No. 10-CV-5248, 2012 WL 868965, at *3 n.4 (E.D.N.Y. Mar. 14, 2012) ("Though generally the Court will not consider factual allegations first submitted in an opposition motion, the mandate to read a pro se plaintiff's papers liberally makes it appropriate to consider plaintiff's additional allegations here, where they are useful in deciphering her

complaint." (collecting cases)). Further, it is appropriate for the court to consider the New York State Division of Human Rights ("DHR") decision rejecting plaintiff's claims (and discussed in further detail below) on this motion to dismiss, because it is referenced in the operative complaint. (*See* Compl. 37.) *See Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 636 (W.D.N.Y. 2014) ("While matters outside the four corners of a complaint are not typically relevant for consideration on a motion to dismiss, materials that are expressly referenced in the complaint and submitted by the parties in connection with the underlying motion, such as the [U.S. Equal Employment Opportunity Commission] charge and DHR complaint at issue in the present motion, may be considered by the Court in connection with the pending motion." (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993))).

In 2009, plaintiff began working as a registered nurse at BCC, a facility operated by OMH that provides behavioral health care services to children with serious emotional disturbances. (Compl. 2.)[2] The events described in plaintiff's Second Amended Complaint began in August 2011. (*Id.*) On August 22, 2011,

---

[2] Although plaintiff occasionally provides paragraph numbers for the allegations in her complaint, she does not do so consistently. Accordingly, the court refers to page numbers when citing to the Second Amended Complaint. Additionally, the court notes that plaintiff attached exhibits organized by letter in the Second Amended Complaint. Some exhibits, however, were either inadvertently or purposefully omitted.

plaintiff's coworker Rexford Cox allegedly falsely accused plaintiff of "hitting him in the head with a lunch tray." (*Id.* 2, 5; *see also id.*, Ex. C; ECF No. 58, Sania Khan Affirmation ("Khan Aff."), Ex. A, DHR Determination and Order After Investigation ("DHR Op.") at 2.) Plaintiff alleges that fear of criminal repercussions stemming from the purportedly false accusation led her to "experience[] mental anguish," caused her blood pressure (for which she took medication) to become elevated, and aggravated her hypertension. (Compl. 20-21.) Three days later, on August 25, 2011, plaintiff sought time off from one of her supervisors, Maryland Johnson, citing "[m]ental [s]tress" on the request form. (*Id.* 3-4, 33; DHR Op. at 2.) Johnson granted plaintiff's request, but allegedly told plaintiff that "this is the last time I will ever sign any paper for you." (*Id.* 3, 33.)

On the morning of September 1, 2011, plaintiff attended a staff meeting. (*Id.* 3; *id.*, Ex. B.) During the meeting, Johnson allegedly told plaintiff that "good nurses were here and had to leave, you can take up your bag and leave now." (*Id.* 3.) Plaintiff contends that the comment caused her to "bec[o]me ill," after which she sought to leave the meeting. (*Id.*) Before she could leave, she felt weak, "knelt down on the floor weeping," and had a "mental breakdown." (*Id.*) Plaintiff's co-worker, "Ms. Duke," subsequently

"grabbed [p]laintiff's head, and held [p]laintiff's head in her
hands, against [p]laintiff's will and over her objections." (*Id.;
see also id.*, Ex. B) According to the Second Amended Complaint,
plaintiff and Duke had previously attended the same church and
"Duke was aware that [plaintiff] did not allow anyone to handle
[her] head." (*Id.* 3.) Duke allegedly "refused to let go until
another nurse yelled at her to release [p]laintiff's head." (*Id.*)

Plaintiff states that she asked a receptionist to call
911 after the incident, but "[d]efendants failed and refused to do
so." (*Id.* 4, 27; *see also* Pl. Opp'n at 16.) Instead, defendants
sent a psychologist to speak with plaintiff. (Compl. 4.) Later on
the same day, plaintiff filed a form titled "Brooklyn Children's
Workplace Violence Reporting Form," describing Johnson's comments
and Duke's alleged assault. (*Id.* 7; *see also id.*, Ex. B) Plaintiff
alleges, however, that although a supervisor signed the form, an
unnamed "police officer . . . refused to sign the form." (*Id.* 6-
7, 16.) Plaintiff claims that defendants refused to investigate
her complaint about the assault. (*Id.* 7-8, 21-23, 28, 30.)

On September 4, 2011, plaintiff was examined as a walk-
in patent at the Kings County Hospital emergency room, where she
was diagnosed with "[u]nspecified essential hypertension" and
discharged a few hours later. (*Id.* 4; *see also id.*, Ex. K.)

According to a physician's report attached to the Second Amended Complaint, plaintiff complained of "stress at work" and hypertension, but denied "chest pain, headache, [shortness of breath], numbness, weakness, tingling [and] other symptoms." (*Id.*) The doctor's report concluded that plaintiff was "not having any symptoms due to [her] elevated blood pressure." (*Id.*) Plaintiff alleges that she began seeing a psychologist — who diagnosed her with anxiety and depression — on September 15, 2011. (Compl. 4.) On September 19, 2011, plaintiff alleges that she again informed defendants of "her disability," describing it on a time off request form as "Mental Stress." (*Id.* 4-5.) In addition to mental stress, plaintiff alleges that she "became disabled under the law" in the "Fall of 2011," and that her "[d]iagnosis of [hypertension] was made known to [defendants] for more than a year before" August 2011. (Compl. 2, 4.)

On October 14, 2011, plaintiff alleges that she was ordered to work in the same room as Duke. (*Id.* 8-9, 15.) Because plaintiff found it "painful to sit and work with Ms. Duke after the assault," she contacted a supervisor, Michael Harrigan. (*Id.* 15-16; *see also* Pl. Opp'n at 7.) Plaintiff told Harrigan that she "was going to lock [her]self in the crash cart room until the matter was addressed." (Compl. 16, 23, 25, 29; *see also id.*, Exs.

E, H.) Plaintiff does not clarify whether she ultimately worked with Duke on October 14, 2011. Plaintiff alleges that Harrigan subsequently assigned her and other nurses additional work to punish plaintiff for her complaint. (*Id.* 26-27; Pl. Opp'n at 21, 28.) Plaintiff alleges that at some point in the "middle of October 2011," she told Harrigan that she "was ready to have a meeting" with Johnson and Duke about the September 1, 2011 event, though the meeting apparently never occurred. (Compl. 29; *id.*, Ex. C; Pl. Opp'n at 20.)

On October 27, 2011, plaintiff had a meeting with a different supervisor, Wendy McIntosh. (Compl. 26; *id.*, Exs. H-I.) McIntosh told plaintiff that plaintiff "should take some time off so [McIntosh could] train another nurse." (*Id.* 30.) Plaintiff contends that the remark was effectively an attempt to force plaintiff's resignation so that she could be replaced. (*Id.* 9, 30.) On October 31, 2011, plaintiff alleges that she made a verbal complaint to a human resources department official about McIntosh's comment. (*Id.* 9, 30.) Plaintiff also alleges that she requested certain accommodations at the October 27, 2011 meeting. She alleges that she asked McIntosh to have defendants: (1) investigate her internal complaints and take remedial action; (2)

ensure that she was not assigned to work with Duke;[3] (3) permit her to continue her medical treatment without interruption; and (4) allow plaintiff to "voice[] her concerns and be listened to." (*Id.* 5-8, 32-33.)

In a December 2011 e-mail exchange between plaintiff and McIntosh regarding the October 27, 2011 meeting, McIntosh wrote to plaintiff that she intended to help plaintiff because plaintiff "sounded very distress[ed] so [McIntosh] felt it appropriate to advi[s]e [plaintiff] to consider taking some time off." (*Id.*, Ex. H.) McIntosh explained further: "**Remember I did not tell you to take time off I told you to consider it.** If you had taken extensive leave because of what you were experiencing, yes I would have to orient someone else to work the clinic until you return because Ms. Duke cannot work alone." (*Id.* (emphasis in original).) Separately, at some point in December 2011, plaintiff alleges that Juliet Skeete, another supervisor, told her: "If I am at a place and no one wants me there, I would not hang around, I would leave."[4] (*Id.* 18, 22, 26, 34.) Skeete's comment caused plaintiff to cry.

---

[3] Plaintiff also states that she told McIntosh in the October 27, 2011 meeting that she "was seeing a psychologist and had "addressed the issue with [the psychologist] so now [plaintiff] was able to work with [Duke]." (Compl. 30.)

[4] On November 13, 2011, plaintiff alleges that she placed a time off request form in Skeete's mailbox. (Compl. 22.) Plaintiff asserts that the form was found two days later by another employee and contends that "[s]omeone" removed the form from Skeete's box. (*Id.*)

(*Id.* 18.) Plaintiff claims that the comments from McIntosh and Skeete amounted to a constructive discharge from BCC. (*Id.* 18-19, 26-28 31.)

On December 27, 2011, plaintiff's physician diagnosed her with hypertension "from Dec. 27-29, 2011." (*Id.*, Ex. D.) The physician wrote, however, that plaintiff could "return to work on Dec. 30, 2011." (*Id.*) On December 30, 2011, plaintiff submitted a letter to defendants stating that she "was separating from her job as a result of harassment." (*Id.* 9; DHR Op. at 1 ("[Plaintiff] resigned on 12/30/2011.").) On January 12, 2012, plaintiff filled out a form – it is not clear whether the form was submitted — complaining about McIntosh's October 27, 2011 statement. (Compl., Ex. I.) On January 16, 2012, plaintiff's separation from BCC became "effective." (*Id.* 9.) Plaintiff alleges that she has since been replaced by another nurse who is not disabled. (*Id.*)

Plaintiff also complains about a number of other undated events that allegedly occurred during her time at BCC:

- An unspecified nurse told plaintiff "[g]et out of my way" after plaintiff was apparently walking slowly. (*Id.* 18.)

- Duke told plaintiff to "shut up." (*Id.* 8.)

- McIntosh told plaintiff to "go look for Mr. Cox and leave Ms. Duke alone." (*Id.* 9.)

- McIntosh said to plaintiff, "[Y]ou teach the children coping skills why don't you use them yourself," suggesting that plaintiff not seek medical treatment. (*Id.*)

## II. *Procedural Background*

On August 21, 2012, plaintiff filed a complaint with the DHR alleging discrimination on the basis of her disability. (DHR Op. at 1.) On February 25, 2013, the DHR issued an opinion concluding that there was no evidence that plaintiff's allegations had "anything to do with [plaintiff's] protected class/disability" or that plaintiff had "suffered any adverse employment action due to her disability." (DHR Op. at 2-3.) Accordingly, the DHR found no probable cause to believe that defendants had engaged in any of the unlawful discriminatory practices about which plaintiff had complained. (*Id.* at 1-2.) The U.S. Equal Opportunity Employment Commission adopted the DHR's findings and dismissed plaintiff's complaint on March 28, 2013.[5] (Khan Aff., Ex. B.)

---

[5] Although it does not appear that plaintiff administratively exhausted all of the claims she brings in this action, exhaustion is not necessary when non-federal employees bring claims under the Rehabilitation Act. *See Finley v. Giacobbe*, 827 F. Supp. 215, 219 n.3 (S.D.N.Y. 1993) ("There is no requirement under the Rehabilitation Act that nonfederal employees exhaust administrative remedies."); *see also Lee v. City of Syracuse*, No. 03-CV-1329, 2005 WL 6779366, at *5 n.4 (N.D.N.Y. Feb. 15, 2005) (same); *Worthington v. City of New Haven*, No. 94-CV-00609, 1999 WL 958627, at *7 (D. Conn. Oct. 5, 1999) (same). To the extent defendants argue otherwise (Def. Mem. at 26-27 ("Even assuming . . . she exhausted her administrative remedies . . . .")), they are incorrect.

On June 13, 2013, plaintiff filed her initial complaint in the instant action, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (ECF No. 1, Complaint.) On March 5, 2015, the court dismissed plaintiff's initial complaint on the basis of Eleventh Amendment immunity. (ECF No. 38.) Although the court held that on the facts of her original complaint that plaintiff had failed to state a claim under the Rehabilitation Act, plaintiff was granted leave to amend her complaint to bring claims under the Act. (*Id.*)

Plaintiff filed an amended complaint (ECF No. 40) and, subsequently, the operative Second Amended Complaint. (Compl.) Defendants moved to dismiss the Second Amended Complaint for failure to state a claim and filed a memorandum in support of the motion. (ECF No. 57, Defendants' Memorandum in Support of Motion to Dismiss ("Def. Mem.").) Plaintiff filed a memorandum in opposition (Pl. Opp'n), to which defendants replied. (ECF No. 61, Defendants' Reply in Support of Motion to Dismiss ("Def. Reply").)

Construing the Second Amended Complaint liberally, plaintiff brings claims under the Rehabilitation Act for: (1) disparate treatment; (2) failure to accommodate; (3) hostile work

environment; (4) constructive discharge; and (5) retaliation.[6]
(Compl. 1, 5-7, 9-10, 20-23.)

## LEGAL STANDARD ON A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint providing only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Additionally, courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Thus, a court must interpret *pro se* complaints "to raise the strongest arguments that they suggest." *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (internal quotation marks and citation omitted). Still, *pro se* "complaints must contain sufficient factual allegations to meet the plausibility standard." *Green v. McLaughlin*, 480 F. App'x 44, 46 (2d Cir. 2012).

---

[6] Plaintiff appears also to allege that unnamed police officers violated New York State Human Rights Law, N.Y. Exec. L. art. 15 ("Article 15") by failing to investigate certain complaints that plaintiff made to defendants. (Compl. 7, 21-22.) Defendants have not addressed plaintiff's Article 15 allegations in their briefing. Plaintiff has not named any police officers in her complaint, or suggested that any of the named defendants are accountable under Article 15. Accordingly, if plaintiff intended to assert any claims under Article 15, they are dismissed with prejudice.

"[A] complaint in an employment discrimination lawsuit [need not] contain specific facts establishing a prima facie case of discrimination" under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002). Although the "pleading standard for employment discrimination complaints is somewhat of an open question" in the Second Circuit, "at a minimum, employment discrimination claims must meet the standard of pleading set forth in *Twombly* and *Iqbal*, even if pleading a prima facie case is not required." *Hedges v. Town of Madison*, 456 F. App'x 22, 23 (2d Cir. 2012). "The elements of a *prima facie* case do, however, provide an outline of what is necessary to render [a plaintiff's employment discrimination] claims for relief plausible." *Pahuja v. Am. Univ. of Antigua*, No. 11-CV-4607, 2012 WL 6592116, at *9 (S.D.N.Y. Dec. 18, 2012) (internal quotation marks and citation omitted). "Courts therefore 'consider these elements in determining whether there is sufficient factual matter in the complaint which, if true, gives Defendant a fair notice of Plaintiff's claim and the grounds on which it rests.'" *Id.* (quoting *Murphy v. Suffolk Cty. Cmty. Coll.*, No. 10-CV-251, 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011)).

**DISCUSSION**

The court will first provide some background on the Rehabilitation Act, and then turn to plaintiff's claims.

**I.    *The Rehabilitation Act of 1973***

Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). "The Rehabilitation Act . . . establishes a comprehensive federal program aimed at improving the lot of the handicapped. Among its purposes are to promote and expand employment opportunities in the public and private sectors for handicapped individuals and place such individuals in employment." *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 157 n.4 (2d Cir. 2013) (internal quotation marks and citations omitted). "Although its terms are broadly drawn, the Rehabilitation Act incorporates the standards of the Americans with Disabilities Act [("ADA")]." *Cheung v. Donahoe*, No. 11-CV-122, 2016 WL 3640683, at *5 (E.D.N.Y. June 29, 2016); *see also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir.

1999) (considering ADA and Rehabilitation claims "in tandem" because "Section 504 of the Rehabilitation Act and the ADA impose identical requirements"). The only significant difference between the two statutes is that the Rehabilitation Act, unlike the ADA, requires that the alleged discrimination take place "*solely* due to an individual's disability." *Amie v. Shinseki*, 806 F. Supp. 2d 641, 644 (W.D.N.Y. 2011) (citations omitted).

Generally, a plaintiff can base a discrimination claim under the Rehabilitation Act on "one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) (citation omitted). Plaintiff's first two claims (for disparate treatment and failure to accommodate) fall within the Second Circuit's recognized theories of liability under the Rehabilitation Act. Plaintiff's third and fourth claims are based, respectively, on hostile work environment and constructive discharge (essentially an aggravated hostile work environment claim (*see infra* Part V)) theories that have not yet been affirmatively recognized under the Rehabilitation Act by the Second Circuit. As discussed further below, the court assumes without deciding that plaintiff can bring claims for hostile work environment and constructive discharge under the Rehabilitation

Act. Plaintiff's fifth claim, for retaliation, is actionable under the Rehabilitation Act.

## II. *Disparate Treatment*

To state a claim for disparate treatment based on a disability under the Rehabilitation Act, a plaintiff must demonstrate that: "(1) she is disabled within the meaning of the Act; (2) she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; (3) she suffered an adverse employment action due *solely* to her disability; and (4) her employer receives federal financial assistance." *Cheung*, 2016 WL 3640683, at *5.

Plaintiff contends, and defendants do not dispute, that defendants receives federal financial assistance. (Compl. 11; Pl. Opp'n at 19.) Defendants argue that plaintiff is not disabled within the meaning of the Act and that she did not suffer an adverse action solely due to her disability. (Def. Mem. at 10-18.)

### A. *Plaintiff is Not Disabled Within the Meaning of the Rehabilitation Act*

Plaintiff first must sufficiently allege that she is disabled within the meaning of the Rehabilitation Act. Both the ADA and the Rehabilitation Act define "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of

16

such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). Plaintiff alleges that she is disabled within the meaning of each of the three categories. (Compl. 11-12.) The court addresses each category in turn.

### i. Plaintiff Has Not Adequately Pled That She Has An Actual Disability

To establish that she suffers from an actual disability, a plaintiff must: "(1) show that [s]he suffers from a physical or mental impairment; (2) identify an activity claimed to be impaired and establish that it constitutes a major life activity; and (3) show that [her] impairment substantially limits the major life activity." *Sternkopf v. White Plains Hosp.*, No. 14-CV-4076, 2015 WL 5692183, at *5 (S.D.N.Y. Sept. 25, 2015) (citing *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998), *superseded on other grounds by* 42 U.S.C. § 12102(3)(A)).

### (a) Impairment

First, the court considers whether plaintiff has adequately alleged that she suffers from a physical or mental impairment within the meaning of the Rehabilitation Act. Liberally construing plaintiff's complaint, she alleges that she suffers

from "anxiety and depression" as well as hypertension.[7] (Compl. 4, 24, 29, 34.)

Regulations interpreting the Rehabilitation Act establish that "[a]ny mental or psychological disorder, such as . . . emotional or mental illness" qualifies as a physical or mental impairment. 45 C.F.R. § 84.3(j)(2)(i)(B); *see also* 29 C.F.R. § 1630.2(h)(2) (analogous regulation in ADA context). Depression and anxiety can therefore be considered mental impairments. *See Dean v. Westchester Cty. P.R.C.*, 309 F. Supp. 2d 587, 593 (S.D.N.Y. 2004) ("Depression is considered a physical or mental impairment under the ADA."); *see also Jones v. HCA*, 16 F. Supp. 3d 622, 632 (E.D. Va. 2014) (finding that "depression and anxiety meet the . . . definition of 'mental' impairment" (citation omitted)); *Crawford v. New York Life Ins. Co.*, No. 04-CV-1853, 2006 WL 2792779, at *6 (E.D.N.Y. Sept. 27, 2006) ("An anxiety disorder can be considered by a court to be a disability if it substantially limits the disabled individual's ability to communicate with others."). Additionally, "hypertension . . . qualif[ies] as [a] physical impairment[]." *Raffaele v. City of New York*, No. 00-CV-

---

[7] Plaintiff alleges that she suffered from "HTN" (Compl. 29, 34), which the court construes as indicating hypertension. *See* 8 Attorneys Medical Advisor § 85:7 ("HTN: hypertension."); *Milien v. Astrue*, No. 10-CV-2447, 2010 WL 5232978, at *3 (E.D.N.Y. Dec. 16, 2010) (construing "HTN" as hypertension).

3837, 2004 WL 1969869, at *13 (E.D.N.Y. Sept. 7, 2004); *see also Boughton v. Town of Bethlehem*, No. 13-CV-1583, 2015 WL 5306077, at *4 (N.D.N.Y. Sept. 10, 2015) ("[T]he record supports the inference that Plaintiff had a physical impairment, i.e., hypertension . . . .").

Plaintiff has adequately pled that she suffers from two mental impairments (depression and anxiety) as well as a physical impairment (hypertension).

(b) <u>Major Life Activities</u>

Plaintiff must next plausibly identify a "major life activity" within the meaning of the Rehabilitation Act that is affected by her impairments. Plaintiff alleges that the major life activities affected by her impairments are: "(a) brisk walking; (b) emotional disturbance; (c) sleeping; (d) feeling of Inferiority; (e) running and attending church[; and] (f) skipping." (Compl. 4.)

Under the Rehabilitation Act and regulations, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see also* 45 C.F.R. §

84.3(j)(2)(ii) (defining "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"). As an initial matter, brisk walking, running, and skipping do not constitute major life activities within the meaning of the Rehabilitation Act and regulations. *See Schroeder v. Suffolk Cty. Cmty. Coll.*, No. 07-CV-2060, 2009 WL 1748869, at *6 n.2 (E.D.N.Y. June 22, 2009) ("[R]unning and jumping have been held to not constitute major life activities within the meaning of the ADA." (collecting cases)); *Rutherford v. Wackenhut Corp.*, No. 04-CV-1216, 2006 WL 1085124, at *4 (E.D. Wis. Apr. 25, 2006) (finding that "skipping" is not a major life activity); *Nedder v. Rivier Coll.*, 908 F. Supp. 66, 76 (D.N.H. 1995) ("[T]he inability to walk at a brisk pace for extended periods does not constitute a significant limitation on the major life activity of walking."). Further, plaintiff's purported "emotional disturbance" and "feeling of Inferiority" are more properly characterized as impairments than major life activities (and are encompassed in the court's analysis regarding plaintiff's alleged depression and anxiety above). (*See supra* Discussion Part II-A-i-(a)).

Sleeping, by contrast, is a major life activity. *See* 42 U.S.C. § 12102(2)(A) (including "sleeping" in a list of "major

life activities" for purposes of the ADA); 29 C.F.R. §
1630.2(i)(1)(i) (same); *Mary Jo C.*, 707 F.3d at 165 (recognizing
sleeping as a major life activity); *Price v. Mount Sinai Hosp.*,
458 F. App'x 49, 51 (2d Cir. 2012) (same).

Church attendance presents a closer call. *Compare
Barfield v. Bell S. Telecomms., Inc.*, 886 F. Supp. 1321, 1324-25
(S.D. Miss. 1995) (assuming without deciding that church
attendance can be a major life activity, but finding that plaintiff
had not shown a substantial limitation of that activity), *with
Bear v. Exxon Mobil Corp.*, No. 03-CV-798, 2004 WL 2603727, at *6
(E.D. La. Nov. 15, 2004) ("[A]lthough the Court recognizes that
attending religious services certainly is important to many
people, the Court does not find that it has the same legal
significance to daily life as do the activities that have been
specifically identified by the regulations and jurisprudence as
constituting major life activities, e.g., breathing, seeing,
walking, bathing, brushing one's teeth, and working."). Although
plaintiff's Second Amended Complaint contains nothing beyond the
conclusory allegation that her ability to attend church has been
affected (Compl. 3), the court will grant plaintiff the benefit of
the doubt and assume without deciding that church attendance
constitutes a major life activity.

(c)  <u>Substantial Limitation</u>

To establish an actual disability, plaintiff finally must show that that her alleged impairment substantially limits a major life activity. The only major life activities plaintiff plausibly alleges are impacted by her purported impairments (depression, anxiety, and hypertension) are sleeping and church attendance. (Compl. 4; *see also supra* Discussion Part II-A-i-(b).)

The term "substantially limits," is "construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). Thus, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* § 1630.2(j)(1)(ii). Plaintiff must still, however, comply with Fed. R. Civ. P. 8 by pleading sufficient facts to "raise a right to relief above the speculative level" and "nudge . . . claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 557, 570; *Gaube v. Day Kimball Hosp.*, No. 13-CV-1845, 2015 WL 1347000, at *7 (D. Conn. Mar. 24, 2015) ("Notwithstanding the . . . direction to broadly construe the term 'substantially limits,' an ADA claimant still must satisfy the pleading requirements of Fed. R. Civ. P. 8 . . . ."); *see also Swierkiewicz*, 534 U.S. at 508 ("We hold that

22

an employment discrimination complaint need not [contain specific facts establishing a *prima facie* case of discrimination] and instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2))).

Difficulty sleeping, the Second Circuit has recognized, is "extremely widespread." *Colwell*, 158 F.3d at 644. A substantial limitation on sleeping must be "worse than is suffered by a large portion of the nation's adult population." *Id.; see also* 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*." (emphasis added)). Conclusory statements regarding sleep difficulties are therefore insufficient to adequately allege a substantial limitation. In *Gaube v. Day Kimball Hospital*, for example, the plaintiff's only allegation regarding sleep was that her depression, migraines, and insomnia "substantially limited [her] . . . ability to get a restful sleep." 2015 WL 1347000, at *8. The court concluded that plaintiff's "bare allegation that her health conditions substantially limited her ability to 'get a restful sleep' is . . . devoid of further factual enhancement showing that her ability to

sleep is substantially limited as compared to that of the general population." *Id.* (finding that plaintiff had not plausibly alleged that her ability to sleep was substantially limited). Similarly, in *Krachenfels v. North Shore Long Island Jewish Health System*, No. 13-CV-243, 2014 WL 3867560 (E.D.N.Y. July 29, 2014), the plaintiff's allegation that her skin inflammation caused her "some difficulty sleeping, without any more detail," was insufficient to defeat summary judgment on the issue of whether her sleep issues were substantially limited. *Id.* at *13. Finally, in *Dancause v. Mount Morris Central School District*, No. 13-CV-6019, 2013 WL 2946063 (W.D.N.Y. June 14, 2013), *aff'd*, 590 F. App'x 27 (2d Cir. 2014), a plaintiff's conclusory allegation that her gum disease prevented her from "adequately . . . sleeping" was deemed insufficient to survive a motion to dismiss. *Id.* at *5.

Here, plaintiff's only allegation regarding sleep appears in a list of "major life activities" she alleges were impacted by her anxiety, depression, and hypertension. (*See* Compl. 4 ("Plaintiff's disabilities substantially limited Plaintiff's major life activities, including among others (a) brisk walking (b) emotional disturbance; (c) sleeping . . . .").) Plaintiff does not provide any further factual support for her purported sleep problems in the Second Amended Complaint. She does not "describe

in any detail the frequency, duration, or severity of [her] sleep impairment" or actually state that her alleged impairments "cause[] [her] sleep impairment" *Telemaque v. Marriott Int'l, Inc.*, No. 14-CV-6336, 2016 WL 406384, at *9 (S.D.N.Y. Feb. 2, 2016) (finding allegations regarding sleep problems insufficient to defeat a motion to dismiss). Like the plaintiffs' sleep-related claims in *Gaube*, *Dancause*, and *Telemaque* — which were rejected on motions to dismiss — plaintiff's sleep-related claims here do not plausibly allege that her sleep was substantially limited.

Further, even assuming religious practice qualifies as a major life activity, plaintiff's allegations regarding church attendance suffer from the same insufficiencies as her sleep-related claims. She merely includes "church attendance" in a list of major life activities. (Compl. 4.) Plaintiff does not explain whether she can no longer attend church at all, whether she simply must attend less frequently, or whether she derives less gratification from religious services. For the same reasons plaintiff's complaint was insufficient regarding her sleep difficulties, it is insufficient regarding her church attendance.[8]

---

[8] Even if the court were to look beyond the Second Amended Complaint and evaluate plaintiff's opposition memorandum, her allegations regarding both sleep and church attendance fall short. Plaintiff does not even mention church attendance in her opposition brief, and her allegations regarding sleep are no more detailed. (*E.g.*, Pl. Opp'n at 24 (allegation that plaintiff's "anxiety level . . . disrupted her ability to sleep").) Although plaintiff adds "eating,"

## ii. Plaintiff Has Not Adequately Pled That She Has a Record of Disability

Plaintiff next alleges that she had a record of hypertension "for more than a year before the incidents" described in the Second Amended Complaint. (Compl. 4.) "The ADA's definition of disability may be satisfied if a plaintiff demonstrates a record of an impairment that substantially limits one or more major life activities." *Levine v. Smithtown Cent. Sch. Dist.*, 565 F. Supp. 2d 407, 425 (E.D.N.Y. 2008) (internal quotation marks and citation omitted). To show a record of impairment, a plaintiff must establish that she "has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment." 29 C.F.R. § 1630.2(k)(2).

Plaintiff's failure to plausibly allege a substantial limitation to a major life activity (*see supra* Discussion Part II-A-i-(c)) precludes her from asserting that she has a record of disability. *See Darcy v. Lippman*, No. 03-CV-6898, 2008 WL 629999,

---

"hearing," and "walking" to a list of affected major life activities for the first time in her opposition (*id.* at 5, 11, 19), she provides no detail about how her impairments limit her ability to eat, hear, or walk. (*See id.* at 19 ("The excessive stress without relief later affected plaintiff's walking, hearing, sleeping and eating."); *id.* at 11 ("My walking is substantially limited. I have substantial hearing loss in left ear also. Sleeping and eating was affected also.").)

at *16 (S.D.N.Y. Mar. 10, 2008) (rejecting record-based disability claim where plaintiff "fail[ed] to plead that he had a substantially limiting impairment when he returned to work"); *Rodriguez v. Verizon Telecom*, No. 13-CV-6969, 2014 WL 6807834, at *5 (S.D.N.Y. Dec. 3, 2014) (finding that plaintiff failed to sufficiently plead a record of disability where he "allege[ed] no facts regarding how his impairment substantially limited a major life activity"). As discussed above, plaintiff's conclusory allegation about sleep problems and church attendance (Compl. 4) are inadequate even at the pleading stage.

### iii. Plaintiff Has Not Adequately Pled That She Was Regarded As Having a Disability

Plaintiff finally alleges that she is "regarded as" having a disability. "Under the third category of the ADA's definition of disability" — the "regarded as" disabled prong — "a plaintiff must allege that he has been subjected to an action prohibited by the ADA . . . because of an actual or perceived impairment that is not both transitory and minor." *Rodriguez*, 2014 WL 6807834, at *5 (internal quotation marks and citation omitted). "A transitory impairment is defined as 'an impairment with an actual or expected duration of [six] months or less.'" *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 250 (E.D.N.Y. 2015) (quoting 42 U.S.C. § 12102(3)(B)).

27

To establish that she is regarded as having a disability, a plaintiff need not "present evidence of how or to what degree [defendants] believed the impairment affected him." *Hilton v. Wright*, 673 F.3d 120, 129 (2d. Cir. 2012); *see also* 42 U.S.C. § 12102(3) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."). For example, in *Rodriguez*, a plaintiff plausibly alleged that he was regarded as suffering from drug and alcohol addiction where "his manager falsely concluded that he was under the influence based on the manager's perception that plaintiff ha[d] a history with addiction." 2014 WL 6807834, at *5. The *Rodriguez* plaintiff did not need to plead that his alcoholism and drug addiction substantially limited any major life activity.

Liberally construing the Second Amended Complaint, plaintiff alleges that she repeatedly told BCC supervisors that she was experiencing mental health issues. (Compl. 4 ("Employer was made aware that plaintiff was experiencing mental anguish . . . .").) Plaintiff, however, fails to plausibly assert

that she did not have an "impairment with an actual or expected duration of [six] months or less." 42 U.S.C. § 12102(3)(B). Plaintiff alleges that she "became disabled under the law" around "the Fall of 2011." (Compl. 2.) Her mental health issues were, however, according to her own complaint, sporadic. For example, she occasionally requested time off and informed her supervisors that her requests were due to her impairments. (*Id.* 18, 22, 30.) At least some of her requests were granted. (*Id.* 33.) Additionally, she attached as an exhibit a letter from a physician stating that plaintiff "had Hypertension from Dec. 27-29 2011 and she was disabled to work" but the physician also wrote that plaintiff could "return to work on Dec. 30, 2011." (*Id.*, Ex. D.) Further, McIntosh's statement to plaintiff that she "should take some time off" does not plausibly allege that McIntosh believed plaintiff to be suffering from an impairment that would last or could be expected to last over six months. (*Id.* 30.)

Accordingly, plaintiff has not adequately pled that she was regarded as having a disability. *See Horsham v. Fresh Direct*, 136 F. Supp. 3d 253, 264 (E.D.N.Y. 2015) ("[A]s the facts are currently pleaded, Defendant appears to have perceived that Plaintiff had only a transitory impairment. As a result, Plaintiff has not sufficiently alleged that he was disabled under the ADA.").

B. *Adverse Action*

Further, even if plaintiff had adequately alleged that she was disabled within the meaning of the Rehabilitation Act, she has not plausibly alleged that she suffered any adverse employment action. Here, reading the Second Amended Complaint liberally, plaintiff alleges seven adverse employment actions: (1) Duke allegedly assaulted her on September 1, 2011; (2) defendants allegedly failed to adequately investigate her complaints about Duke's purported assault; (3) she was allegedly forced to work with Duke on October 14, 2011; (4) she was given additional work by Harrigan; (5) McIntosh stated to her that she should "take some time off"; (6) co-workers and supervisors allegedly made assorted mean-spirited comments to her; and (7) she was purportedly constructively discharged.[9]

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). To qualify as materially adverse, a change in working conditions must be "'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"

---

[9] The court addresses, and rejects, plaintiff's constructive discharge claim separately *infra*. (*See* Discussion Part V.)

*Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 434 (E.D.N.Y. 2015) (quoting *Galabya*, 202 F.3d at 640). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities . . . ." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (internal quotation marks and citation omitted). Because the meaning of an adverse employment action in Rehabilitation Act and ADA discrimination actions is the same as in Title VII discrimination actions, *see Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 329 n.14 (S.D.N.Y. 2015) ("An adverse employment action has the same meaning in ADA discrimination claims as it does in the Title VII context." (citing *Adams v. Festival Fun Parks, LLC*, 560 F. Appx. 47, 49 (2d Cir. 2014))), the court also refers to Title VII cases below in evaluating whether plaintiff sustained an adverse employment action.

None of the purportedly adverse actions alleged by plaintiff qualify as adverse employment actions. The alleged assault by Duke, who held plaintiff's head when she kneeled to the floor crying, did not alter the terms or conditions of plaintiff's employment. *Compare Mathirampuzha v. Potter*, 548 F.3d 70, 73, 79

(2d Cir. 2008) (finding no adverse employment action on summary judgment where an indirect supervisor "grabbed the plaintiff's arm, punched him in the shoulder and the chest, spit in his face, and poked him in the eye"), *with* Compl. 3 ("Ms. Duke . . . held Plaintiff's head in her hands."). Additionally, defendants' purported failure to investigate plaintiff's complaints does not constitute an adverse employment action. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."). Plaintiff's allegations that she was forced to work with a hostile co-worker and was ignored by her supervisors are not adverse employment actions. *See Carpenter v. City of Torrington*, 100 F. App'x 858, 860 (2d Cir. 2004) ("Although she claims she was forced to share an office with a hostile co-worker and was given a 'silent treatment,' these claims do not amount to a 'materially adverse change' in the terms and conditions of employment.").

Plaintiff also appears to argue that she was given additional work in retaliation for exercising her rights under the Rehabilitation Act. (Compl. 30 ("I was retaliated against because

I asked Supervisors to address complaint. Mr. Harrigan gave plaintiff additional work.").) "[A]ssignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where . . . the rate of pay and benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013) (collecting cases); *see also Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not 'radically change' the nature of work are not typically adverse employment actions." (alteration omitted) (citing *Galabya*, 202 F.3d at 640)). Here, plaintiff does not allege the nature of the additional work. Nor does she allege that the additional work was outside of her general responsibilities. Additionally, she does not plausibly contend that there was a radical change in the nature of her work responsibilities. Plaintiff's allegation regarding additional work is far too conclusory to constitute an adverse employment action.[10]

Plaintiff also appears to argue that McIntosh's statement on October 27, 2011 that plaintiff should "take some

---

[10] Even if the additional work did constitute an adverse employment action, plaintiff did not adequately plead a causal nexus between the additional work and her disability. For example, plaintiff stated that other employees (who she does not allege suffered from any disabilities) were asked to do more work as well. (Compl. 16, 26.)

time off so [McIntosh could] train another nurse" (Compl. 30; *see also id.*, Ex. H) constituted an adverse employment action. No action was taken after the meeting, however. Plaintiff was not terminated, she was not demoted, she did not lose benefits, and she did not have fewer responsibilities. *See Feingold*, 366 F.3d at 152. No consequences of any kind flowed from McIntosh's statement, according to plaintiff's complaint. McIntosh's statement to plaintiff on October 27, 2011, therefore, did not effect a "'materially adverse change' in the terms and conditions of [plaintiff's] employment." *Galabya*, 202 F.3d at 640.

Plaintiff also alleges a series of comments directed at her from supervisors and co-workers were adverse employment actions. For example, plaintiff alleges that she was told to "shut up," to use her "coping skills" and to "get out of [the] way" by other nurses and supervisors. (Compl. 8-9, 18, 28.) Additionally, plaintiff alleges that: (1) Johnson told her that "good nurses were here and had to leave, you can take up your bag and leave now" and (2) Skeete stated, "If I am at a place and no one wants me there, I would not hang around, I would leave." (*Id.* 3, 18.) The Supreme Court has held, however, that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions

34

of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788
(1998) (internal quotation marks and citation omitted). The
comments about which plaintiff complains are properly
characterized as "offhand comments" and "isolated incidents." *See*
*Malgieri v. Ehrenberg*, No. 12-CV-2517, 2012 WL 6647515, at *7
(S.D.N.Y. Dec. 21, 2012) (finding that "being told to 'shut
up' . . . hardly constitutes adverse action" for purposes of a
retaliation claim); *Maysonet v. Thompson*, No. 03-CV-5223, 2005 WL
975897, at *9 (S.D.N.Y. Apr. 25, 2005) ("[R]emarks that make an
employee feel 'frightened' or 'intimidated' do not constitute an
adverse employment action unless the employee suffered a material
adverse change in the terms and conditions of employment." (citing
*Torres v. Pisano*, 116 F.3d 625, 639-40 (2d Cir. 1997))). The
comments about which plaintiff complains did not alter the terms
and conditions of her employment.[11]

---

[11] The court provides a more detailed claim-by-claim analysis regarding the
adverse actions plaintiff alleges she suffered when addressing plaintiff's
retaliation claim. (*See infra* Discussion Part VI.) The Rehabilitation Act's
anti-retaliation protections extend beyond its substantive anti-discrimination
protections. *See Vale*, 80 F. Supp. 3d at 439 ("[U]nlike claims of
discrimination, which limit what qualifies as an 'adverse employment action' to
changes in the terms and conditions of employment, adverse employment actions
in the context of a claim of retaliation are much broader." (internal quotation
marks and citations omitted)). The bar for establishing an adverse action in
the retaliation context is therefore lower than in the discrimination context.
In addition, adverse actions in the retaliation context can be viewed in the
aggregate, whereas adverse actions in the discrimination context must be
evaluated individually. *See Lewis v. Boehringer Ingelheim Pharm., Inc.*, 79 F.
Supp. 3d 394, 412 (D. Conn. 2015) ("Although incidents may be considered in the
aggregate in the retaliation context . . . , courts have not yet recognized

## III. *Failure to Accommodate*

Plaintiff next alleges that defendants failed to accommodate her disabilities. Plaintiff asserts that defendants should have accommodated her by: (1) investigating her internal complaints and taking remedial action; (2) ensuring that she was not assigned to work with Duke; (3) permitting her to continue her medical treatment without interruption; and (4) allowing plaintiff to "voice[] her concerns and be listened to." (Compl. 5-8, 32-33.)

A plaintiff can state a claim for employment discrimination premised on an employer's failure to accommodate her disability by alleging facts showing that: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer*

___

such claims in the discrimination context." (internal quotation marks and citations omitted)). The court's conclusion that plaintiff has not plausibly alleged an adverse action for purposes of her retaliation claim (*infra* Discussion Part VI-A) therefore provides even further support for the conclusion that she has not alleged an adverse employment action for purposes of her discrimination claim. *See Bailey v. Wash. Metro. Area Transit Auth.*, 810 F. Supp. 2d 295, 302 (D.D.C. 2011) ("If the severance package and discussion do not constitute adverse employment action for the purpose of Plaintiff's retaliation claim, *a fortiori*, they do not constitute such for her discrimination claim.").

*Products Mfg. Co.*, 583 F.3d 92, 96-97 (2d Cir. 2009); *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995) (recognizing that the elements of a failure-to-accommodate discrimination claim under the ADA and § 504 of the Rehabilitation Act are identical, other than § 504's requirement that the employer receive federal funding). An employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (applying § 12112(b)(5)(A) in Rehabilitation Act context).

Here, as discussed earlier (*see supra* Discussion Part II-A), plaintiff has not plausibly alleged that she has a disability within the meaning of the Rehabilitation Act. Because a plaintiff must adequately plead that she has a disability to state a claim for failure to accommodate, plaintiff's failure to accommodate claim must fail. *See Fairbrother v. Donahoe*, No. 12-CV-6321, 2014 WL 4685298, at *4 (W.D.N.Y. Sept. 19, 2014) ("To establish a claim for failure to accommodate, a plaintiff must demonstrate that . . . he was 'disabled' within the meaning of the

[Rehabilitation Act] . . . ." (internal quotation mark and citation omitted)); *see also McBride*, 583 F.3d at 96-97 (same).

## IV. *Hostile Work Environment*

Plaintiff next alleges that defendants subjected her to a hostile work environment. The Second Circuit "has not yet decided whether a hostile work environment claim may be made under the ADA." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 n.2 (2d Cir. 2014); *see also Preston v. Bristol Hosp.*, No. 15-1150, 2016 WL 1253872, at *2 n.3 (2d Cir. Mar. 31, 2016) (same). The court will assume for purposes of this decision that a hostile work environment claim is actionable under the ADA, and, therefore, is also actionable under the Rehabilitation Act. The court will employ the standards applicable to a hostile work environment claim in the Title VII context. *See Wesley-Dickson*, 586 F. App'x at 746 (applying Title VII standards to ADA hostile work environment claim).

A hostile work environment claim requires a plaintiff to prove two principal elements. First, she must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Lekettey v. City of New York*, 637 F. App'x

38

659, 661 (2d Cir. 2016) (internal quotation marks and citation omitted). The complained-of conduct must be objectively hostile or abusive; the plaintiff must subjectively perceive the conduct as hostile or abusive; and the conduct must create the environment because of the plaintiff's disability. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001). If a plaintiff relies on multiple events, "[t]he incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks and citations omitted); *see also Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."). Courts examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) (calling for totality of the circumstances inquiry).

Second, a plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile

environment to the employer." *Lekettey*, 637 F. App'x at 661 (internal quotation marks and citation omitted). "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Perry*, 115 F.3d at 149 (internal quotation marks and citation omitted). "[W]here a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers . . . ." *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir. 1994).

Here, plaintiff's hostile work environment claim cannot succeed. As an initial matter, as discussed earlier (*see supra* Discussion Part II-A), plaintiff has not adequately pled that she has a disability within the meaning of the Rehabilitation Act, a prerequisite to stating a claim for a hostile work environment in the disability context. *See Smith v. Cingular Wireless*, 579 F. Supp. 2d 231, 240-41 (D. Conn. 2008) ("As a prerequisite for bringing her hostile work environment and wrongful termination claims under the ADA, [a plaintiff] must show that she is 'disabled' within the meaning of the ADA." (citation omitted));

*Caruso v. Camilleri*, No. 04-CV-167, 2008 WL 170321, at *28 (W.D.N.Y. Jan. 15, 2008) ("As a threshold matter, as the court has determined that Plaintiff has not established that he is a qualified person with a disability under the ADA, Plaintiff's hostile work environment claim based on his alleged disability must also fail.").

Even assuming plaintiff had adequately pled that she suffers from a disability, her hostile work environment claim fails for two additional reasons. First, plaintiff does not allege a causal relationship between many of the incidents underlying her complaint and her alleged disabilities (hypertension, anxiety, and depression). Second, the isolated incidents about which plaintiff complains (those causally related to her purported disabilities) do not establish a workplace "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Lekettey*, 637 F. App'x at 661 (internal quotation marks and citation omitted).

A.    *Plaintiff Fails to Allege a Causal Relationship Between Her Impairments and Much of the Purported Discrimination*

First, plaintiff does not allege a causal relationship between the vast majority of the incidents underlying her complaint and her alleged disabilities (hypertension, anxiety, and

41

depression). *See Missick v. City of New York*, 707 F. Supp. 2d 336, 355 (E.D.N.Y. 2010) (recognizing that a plaintiff "must demonstrate that she suffered such abuse because of her membership in a protected class; i.e., she must establish a causal link between an employer's discriminatory animus and the hostile conduct complained of"); *see also Adams v. New York State Educ. Dep't*, No. 08-CV-5996, 2010 WL 4970011, at *3, *10 (S.D.N.Y. Dec. 8, 2010) (sanctioning attorney who "reassert[ed] a hostile work environment claim without alleging a causal connection between plaintiffs' membership in a protected class and the 'hostile' [work environment], even though [the court] had dismissed those claims on that basis"), *report and recommendation adopted in relevant part sub nom. Adams v. New York State Dep't of Educ.*, 855 F. Supp. 2d 205 (S.D.N.Y. 2012).

As set forth below, there are insufficient facts in the operative complaint to establish a plausible connection between plaintiff's alleged disability and the allegedly hostile work environment:

- Plaintiff's vague allegation that a coworker falsely accused her of hitting him with a lunch tray is not linked to her purported impairments. (Compl. 2, 20; *id.*, Ex. C.)

- Plaintiff does not allege that Duke inappropriately "grabbed" her head (*id.* 3) because of plaintiff purported impairments.

42

- Plaintiff does not plausibly allege that she was ordered to perform additional work by Harrigan (*id.* 16) or ordered to work with Duke (*id.* 15) because of her purported impairments.

- Plaintiff's ambiguous allegation regarding a time-off form disappearing from Skeete's mailbox (*id.* 22; Pl. Opp'n at 20 ("I cannot blame anyone for this . . . .")) is not connected by any alleged facts to her purported impairments.

- Plaintiff does not allege that other nurses told her to "shut up" and to "get out of [their] way" (Compl. 8, 18) because of her purported impairments.

- Plaintiff does not allege that there was any connection between her purported impairments and the following statements by her supervisors: (1) "[G]ood nurses were here and had to leave, you can take up your bag and leave now." (*id.* 3, 33); (2) "[G]o look for Mr. Cox and leave Ms. Duke alone." (*id.* 9); (3) "If I am at a place and no one wants me there, I would not hang around, I would leave." (*Id.* 18, 22, 26, 34.)

In similar cases involving mental health issues, even where hostile work environment claims were dismissed, the alleged discrimination was far more directly linked to the alleged disability. *E.g.*, *Robinson v. Purcell Const. Corp.*, 859 F. Supp. 2d 245, 251-52, 255, 261 (N.D.N.Y. 2012) (granting summary judgment to defendants on hostile work environment claim brought by plaintiff who had been taking medication to treat her anxiety, depression, and post-traumatic stress disorder and who alleged that defendants asked her why her medication made her "all weird," joked that she "must not've taken [her] meds" on a particular day, and stated that she was "too hyper on [her] medicine").

43

Many of plaintiff's allegations suggest that the alleged harassment triggered her impairments (rather than the impairments eliciting the harassment). Plaintiff has, in other words, reversed cause and effect. (*See* Compl. 24 (alleging that plaintiff's "supervisors underst[ood] that inflicting pain could . . . cause someone to become sick thus affecting activity of daily living"); *id.* 34 ("After complaint of harassment, discrimination and humiliation from BCC, I was faced with great emotional distress.").) For example, under the heading "Causal connection Between Protected Activity and Adverse Action," plaintiff alleges that she "was experiencing mental anguish *after* Mr. Cox accused me of hitting him with a lunch tray." (*Id.* 33 (emphasis added).) Similarly, she contends that that one of Skeete's statements to her ("If I am at a place and no one wants me there, I would not hang around, I would leave") caused her to "cry" and to see a psychologist. (*Id.* 18.)

Only three of plaintiff's allegations appear even remotely linked to her alleged disability: (1) plaintiff's allegation that Johnson resented plaintiff's "mental stress" and therefore, after signing off on a leave request, stated "this is the last time I will ever sign any paper for you" (*id.* 3); (2) McIntosh's statement to plaintiff, in light of her mental health

issues, that she "should take some time off so [McIntosh] [could] train another nurse" (*id.* 30); and (3) McIntosh's statement that plaintiff "teach[es] the children coping skills," and so should "use them [her]self." (*Id.* 9.)

B.    *Plaintiff's Work Environment Was Not Hostile*

The court turns next to an analysis of whether the three incidents described above — the only incidents causally linked to plaintiff's alleged impairments — state a plausible hostile work environment claim. Evaluated individually or collectively, the court concludes that they would not establish a plausible hostile work environment claim. First, the incidents were not frequent (only three total events allegedly touch on plaintiff's claimed disabilities) or severe. Plaintiff's complaint that Johnson stated "this is the last time I will ever sign any paper for you" was, in fact, followed by Johnson signing off on a leave request. (*Id.* 3, 33.) Plaintiff's complaints regarding McIntosh's statements that plaintiff should use her "coping skills" to deal with her depression and should "take some time off" cannot fairly be objectively characterized as particularly insulting, abusive, or intimidating. *See Feingold*, 366 F.3d at 150 ("[T]he misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment . . . ." (internal quotation

45

marks and citation omitted)). Second, none of the three statements suggested any potential physical threat. Finally, the statements would not significantly interfere with a reasonable individual's work performance. *See Harris*, 510 U.S. at 23 (instructing courts to consider frequency and severity of discriminatory conduct, whether it was physically threatening or a mere offensive utterance, and whether it would unreasonably interfere with a reasonable employee's work performance). Instead, the "isolated incidents" more closely resemble "offhand comments" or "[s]imple teasing" that "will not support a claim of discriminatory harassment." *Petrosino*, 385 F.3d at 223; *Robinson v. Dibble*, 613 F. App'x 9, 13 (2d Cir. 2015) ("[Plaintiff has offered] evidence of crude and offensive comments directed at her gender or mental health issues that were delivered sporadically by coworkers which, while condemnable, did not rise to the level of creating an abusive and hostile workplace environment.").

Even taking all of plaintiff's allegations as true — and considering both the allegations plausibly related to plaintiff's impairments as well as the allegations unrelated to her impairments — she cannot make a prima facie showing that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the

conditions of [her] employment and create an abusive working environment." *Lekettey*, 637 F. App'x at 661 (internal quotation marks and citation omitted). (*See also* DHR Op. at 2 ("The record does now show that Complainant suffered any adverse employment action due to her disability.").)

## V.   *Constructive Discharge*

Plaintiff also appears to bring a constructive discharge claim. (Compl. 9-10, 12.) "Constructive discharge is regarded as an aggravated case of hostile work environment." *Ferraro v. Kellwood Co.*, No. 03-CV-8492, 2004 WL 2646619, at *11 (S.D.N.Y. Nov. 18, 2004). The Supreme Court has described a constructive discharge claim as a "'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Pa. State Police v. Suders*, 542 U.S. 129, 147-48 (2004). Consequently, "[w]ithout an actionable hostile environment claim, a plaintiff's constructive discharge claim must also fail." *O'Neal v. State Univ. of New York*, No. 01-CV-7802, 2006 WL 3246935, at *12 (E.D.N.Y. Nov. 8, 2006) (internal quotation marks, citation, and alteration omitted); *see also Collazo v. Cty. of Suffolk*, No. 12-CV-2196, 2016 WL 660856, at *10 (E.D.N.Y. Feb. 17, 2016) (same). Here, because plaintiff has not stated a hostile work environment claim (*see supra* Discussion Part IV), *a fortiori* she has not stated a claim for

47

constructive discharge. *See Murphy v. BeavEx, Inc.*, 544 F. Supp. 2d 139, 153–54 (D. Conn. 2008) (holding that plaintiff "has not brought forth sufficient evidence to support a hostile work environment claim," so "any allegation of a constructive discharge must also fail").

## VI.  *Retaliation*

Plaintiff next alleges that defendants retaliated against her for lodging complaints about discriminatory behavior. "The Rehabilitation Act, through regulations promulgated by the Department of Labor, prohibits retaliation against employees for their opposition to practices made unlawful by the Act." *Thomas v. Dep't of Veterans Affairs*, No. 05-CV-5348, 2006 WL 1636738, at *14 (S.D.N.Y. Apr. 3, 2006) (citing 29 C.F.R. § 1614.101), *report and recommendation adopted*, 2006 WL 1594481 (S.D.N.Y. June 6, 2006). A retaliation claim requires a plaintiff to show that: (1) she was engaged in protected activity; (2) the alleged retaliator knew the plaintiff was engaged in protected activity; (3) "an adverse decision or course of action was taken against plaintiff"; and (4) "a causal connection exists between the protected activity and the adverse action."[12] *Weixel v. Bd. of Educ. of City of New York*, 287

---

[12] "[T]he causation standard for retaliation claims under the ADA . . . and the Rehabilitation Act . . . has not been definitively resolved . . . ." *Gallagher v. Town of Fairfield*, No. 10-CV-1270, 2015 WL 3453342, at *8 n.10 (D. Conn. May

F.3d 138, 148 (2d Cir. 2002) (internal quotation marks and citation omitted), *superseded by statute on other grounds by* 42 U.S.C. § 12102(3)(A). Significantly, a "claim of retaliation for protected conduct is a separate claim" from a discrimination claim and "does not depend on the success of the employee's disability claim." 2 Americans with Disab.: Pract. & Compliance Manual § 7:397; *see also Taylor v. Lenox Hill Hosp.*, No. 00-CV-3773, 2003 WL 1787118, at *6 (S.D.N.Y. Apr. 3, 2003) ("The fact that plaintiff was not actually disabled within the meaning of the ADA does not affect his retaliation claim . . . ."), *aff'd*, 87 F. App'x 786 (2d Cir. 2004).

A.  *Adverse Action*

Plaintiff's retaliation claim fails because she has not shown that she suffered an adverse action. For an employee to show adverse action in the retaliation claim context, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "[P]etty slights, minor annoyances, and simple

---

29, 2015) ("[S]ubstantial authority suggests that a plaintiff alleging retaliation must establish that retaliation was a 'but-for' cause of the adverse action and not simply a 'substantial' or 'motivating' factor."). Because plaintiff does not plausibly allege that she was retaliated against on the basis of her disability under either standard, the court need not resolve the issue of which causation standard applies.

lack of good manners" will not normally constitute adverse actions for purposes of a retaliation claim." *Id.* A plaintiff must show "material adversity," because "it is important to separate significant from trivial harms." *Id.* at 68. "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) ("[T]his ridicule was considered a part of a larger campaign of harassment which though trivial in detail may have been substantial in gross, and therefore was actionable." (internal quotation marks and citation omitted)).

Additionally, the adverse action inquiry is the same under the Rehabilitation Act, the ADA, Title VII, and the First Amendment. *See Manon v. Pons*, 131 F. Supp. 3d 219, 232 n.8 (S.D.N.Y. 2015) ("The standard for an 'adverse action' in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context." (citing *Zelnik*, 464 F.3d at 227)); *Noon v. Int'l Bus. Machines*, No. 12-CV-4544, 2013 WL 6504410, at *6 (S.D.N.Y. Dec. 11, 2013) ("Courts

use the same definition for 'adverse employment action' in discrimination claims brought under the ADA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967." (citations omitted)). Accordingly, the court discusses cases below that arose outside of the disability context.

Here, plaintiff's retaliation claim is insufficient. She does not specify the adverse actions taken against her or their causal connection to protected activity. The court will assume for purposes of this decision that plaintiff engaged in protected activity as early as August 25, 2011, when she requested time off due to her disability. (Compl. 3.) *See Weixel*, 287 F.3d at 149 (recognizing that requests for accommodation can be protected activities under the Rehabilitation Act); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 444 (E.D.N.Y. 2009) ("Plaintiff's request for additional leave time as an accommodation of her disability constituted protected activity under the ADA . . . .").

Reading the Second Amended Complaint liberally, plaintiff alleges seven adverse actions: (1) Duke's inappropriately holding her head on September 1, 2011; (2) defendants' failure to adequately investigate her allegations surrounding Duke's assault; (3) being forced to work with Duke on October 14, 2011; (4) being given a single additional work

51

assignment by Harrigan; (5) McIntosh's statement to plaintiff that she should "take some time off"; (6) additional assorted allegedly mean-spirited comments from co-workers and supervisors; and (7) her purported constructive discharge.[13] The court will first evaluate the potential adverse actions individually and then consider them collectively. *See Hicks*, 593 F.3d at 165 (directing courts to evaluate acts of retaliation "both separately and in the aggregate").

### i. Alleged Assault

Physical assaults can constitute adverse actions for purposes of a retaliation claim. *See Rivers v. New York City Hous. Auth.*, No. 11-CV-5065, 2016 WL 1305161, at *24 (E.D.N.Y. Mar. 31, 2016) (recognizing that "[p]hysical assaults qualify as adverse employment actions for purposes of a First Amendment retaliation claim"); *Rivera v. Goord*, 119 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2000) (same). Even assuming for purposes of this decision that the assault constitutes an adverse action, however, plaintiff never suggests that Duke assaulted her because of her disability. (*See also supra* Discussion Part II-B.) Any argument that the assault qualifies as an actionable adverse action must therefore fail.

---

[13] The court has already discussed and rejected plaintiff's constructive discharge claim. (*See supra* Discussion Part V.)

### ii.  Failure to Investigate the Assault

Plaintiff also argues that defendants' failure to investigate her complaints about Duke's assault was an adverse employment action. (*See* Compl. 7 ("Defendants here violated the law by failure to investigate a discrimination report linked to harassment and assault."). She appears to also suggest that defendants similarly failed to follow up on other unspecified complaints. (*Id.* 8, 22-23, 28.)

As an initial matter, generally "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 721; *see also Petyan v. New York City Law Dep't*, No. 14-CV-1434, 2015 WL 1855961, at *11 (S.D.N.Y. Apr. 23, 2015) ("[F]ailure to properly investigate [plaintiff's] claim does not constitute an adverse employment action." (collecting cases)), *report and recommendation adopted*, 2015 WL 4104841 (S.D.N.Y. July 2, 2015); *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 374 (E.D.N.Y. 2014) (finding, in discrimination context, that "an employer's failure to investigate discrimination claims is not an adverse employment action"). Accordingly, plaintiff's allegation that defendants failed to investigate her complaints of discrimination on the basis

of her alleged disability fails to state an adverse employment action. *See Fincher*, 604 F.3d at 721 ("An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all.").

The Second Circuit has indicated, however, that certain failures to investigate could potentially be considered adverse employment actions where the failure to investigate a complaint is in retaliation for "a separate, protected act by the plaintiff." *See id.* at 722. In *Fincher*, the court discussed *Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006), in which the defendant (the Attorney General, through the Federal Bureau of Investigation) was alleged to have failed to investigate a death threat against an FBI employee and his wife because he had earlier filed a complaint of discrimination. *See id.* at 1219-20 ("The retaliatory conduct [plaintiff] alleges, to wit, the FBI's refusal to investigate, as it would ordinarily do for any member of the public, a death threat made against him by a federal prison inmate, [constitutes an adverse action]."). The Second Circuit distinguished the above potentially actionable scenario from the more common fact pattern

in which the purported harm is alleged to have arisen directly from the failure to investigate the original complaint of discrimination. *See Fincher*, 604 F.3d at 722.

Here, based on a liberal construction of plaintiff's operative complaint, she alleges that defendants failed to investigate her complaint regarding Duke's assault *because* of her earlier, protected complaints regarding her disability. (*See* Pl. Opp'n at 19 ("Safety Officer did not investigate and did not sign form. Safety Officer knew that this plaintiff had a mental breakdown 9/1/2011.").) The failure to investigate Duke's alleged assault is, however, qualitatively different from the failure to investigate a death threat against an FBI agent and his family. *See Fincher*, 604 F.3d at 727 n.7 ("Of course, in *Rochon*, the separate complaint that was allegedly ignored as a result of the filing of the initial complaint was of a particularly serious nature."). The court is not satisfied that the failure to investigate Duke's assault would "dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57.

To the extent plaintiff argues that the failure to contact emergency services after the incident with Duke constitutes an adverse action, the court concludes otherwise. By

plaintiff's own account, defendants summoned a psychologist to speak with plaintiff immediately after the incident. (Compl. 4.) Plaintiff states that she "walked with the psychologist to the Human Resources office after she felt better." (*Id.*) Plaintiff explains further in her opposition memorandum that the psychologist "sat and spoke with plaintiff for a long time about the incident," "[l]istened to plaintiff[,] and was of great help." (Pl. Opp'n at 16.) The failure to call emergency services under the circumstances plaintiff describes did not constitute an adverse action.

### iii. Request for Assignment Away From Duke

Plaintiff also argues that defendants retaliated against her by refusing to accommodate her request not to work with Duke. (Compl. 15 ("On 10/14/2011 BCC ordered that this plaintiff should report and work with Ms. Duke . . . . I realized BCC was pushing me over the edge.").)

Generally, "a failure to provide . . . an accommodation is not in and of itself an adverse employment action" *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05-CV-6496, 2010 WL 1326779, at *20 (S.D.N.Y. Mar. 31, 2010); *Gallagher v. Town of Fairfield*, No. 10-CV-1270, 2011 WL 3563160, at *5 (D. Conn. Aug. 15, 2011) ("[Plaintiff] claims that the defendants' alleged failure to

accommodate her requests constitute an adverse employment action. While courts may consider the underlying conduct of an alleged failure to accommodate, a failure to accommodate, by itself, is not sufficient for purposes of establishing an adverse employment action."). Further, in similar circumstances where individual plaintiffs were made to work with their purported harassers, courts have refused to find such assignments adverse actions. *See E.E.O.C. v. Bass Pro Outdoor World, LLC*, No. 11-CV-3425, 2013 WL 1124063, at *6 (S.D. Tex. Mar. 18, 2013) (finding no adverse action for purposes of retaliation claim where employee was "forced to work with [a] purported harasser"); *see also Goodwine v. Conn. Dep't of Children & Families*, No. 08-CV-532, 2011 WL 130345, at *2, *5 (D. Conn. Jan. 14, 2011) (in discrimination context, finding defendant's failure to transfer alleged harasser — who had, *inter alia*, allegedly "struck [plaintiff] on the head" — did not constitute an adverse employment action).

Accordingly, defendants' failure to adjust plaintiff's schedule so she would not have to work with Duke — in order to accommodate plaintiff's alleged disability — cannot constitute an adverse action under the Rehabilitation Act.

### iv. Additional Work Assignments

Plaintiff also argues that she was given additional work in retaliation for exercising her rights under the Rehabilitation Act. (Compl. 26 ("I was retaliated against because I asked Supervisors to address complaint. Mr. Harrigan gave plaintiff additional work.").)

Additional work assignments will generally not constitute adverse actions for purposes of a retaliation claim. *See Mutts v. S. Conn. State Univ.*, 242 F. App'x 725, 727 (2d Cir. 2007) (finding that plaintiff could not show that "assigning her an increased workload due to hiring freezes" resulted in a materially adverse change in her working conditions); *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007) (concluding, pre-*White*[14], that a plaintiff could not state a claim for retaliation where she failed to plead facts demonstrating that her workload was heavily disproportionate to others in her department). Here, plaintiff's bare, conclusory

---

[14] Before *White*, 548 U.S. at 57, plaintiffs alleging retaliation had to show a "materially adverse change in the terms, privileges, duration, or conditions of her employment." *Delgado*, 485 F. Supp. 2d at 461 (Title VII context); *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (same, in ADA context).

allegation that she was assigned extra work is insufficient to show that she suffered an adverse action.[15]

###### v.   McIntosh's "Take Time Off" Comment

Plaintiff also argues that McIntosh told her to "take some time off so [McIntosh could] train another nurse." (Compl. 30; *see also id.*, Ex. H.) According to the Second Amended Complaint, the conversation with McIntosh occurred on October 27, 2011. (Compl. 5, 30; *id.*, Ex. H.) Plaintiff understood McIntosh's statement that plaintiff should "take some time off" as effectively "advising [p]laintiff that she would be replaced." (*Id.* 9.) As set forth in plaintiff's Second Amended Complaint, on December 12, 2011, plaintiff wrote an e-mail to McIntosh reminding McIntosh of the October 27, 2011 discussion, and explaining that she was "trying to give you an answer to your request" (regarding plaintiff taking time off) and that McIntosh's "request" made plaintiff "feel very uncomfortable." (*Id.*, Ex. H.) McIntosh responded by e-mail on December 13, 2011:

> When we spoke you sounded very distress[ed] so I felt it appropriate[] to advi[s]e you to consider taking some time off. **Remember I did not tell you to take time off I told you to consider it.** If you had to take extensive leave because of what you were experiencing, yes I would

---

[15] Even if the additional work here could constitute an adverse action, plaintiff did not adequately plead a causal nexus between the additional work and her disability. (*See supra* Discussion Part II-B.)

have to orient someone else to work the clinic until you
return . . . .

(*Id.* (emphasis in original).)

McIntosh's statement to plaintiff on October 27, 2011
was not an adverse action. *See White*, 548 U.S. at 57. Nearly two
months passed between McIntosh's statement to plaintiff and
December 30, 2011, when plaintiff "submitted a letter to Defendants
stating that she was separating from her job as a result of
harassment." (Compl. 9.) McIntosh's e-mail suggests that she and
plaintiff had no further discussions between October 27, 2011 and
December 30, 2011 regarding the subject of "time off." During those
two months, there were no changes in plaintiff's employment status.
There was apparently no follow-up from McIntosh after the October
27, 2011 meeting, so plaintiff appears to have revisited the issue
for the first time with McIntosh on December 12, 2011. Even
assuming McIntosh "told" plaintiff to take significant time off
(or leave BCC), plaintiff apparently did not do so. Instead,
plaintiff continued to work at BCC until December 30, 2011, when
she submitted her letter of resignation. (*Id.*) Under the alleged
circumstances, McIntosh's statement to plaintiff telling her to
consider taking time off would not "dissuade a reasonable worker
from making or supporting a charge of discrimination." *White*, 548
U.S. at 57.

### vi. Additional Comments

Plaintiff finally argues that a number of additional comments by her co-workers and supervisors were adverse employment actions.

Plaintiff alleges the following comments occurred while she was working at BCC:

(1) "[G]ood nurses were here and had to leave, you can take up your bag and leave now." (Compl. 3, 33)

(2) "If I am at a place and no one wants me there, I would not hang around, I would leave." (*Id.* 18, 22, 26, 34.)

(3) "Get out of my way." (*Id.* 18.)

(4) McIntosh's statement that plaintiff "teach[es] the children coping skills," so should "use them [her]self." (*Id.* 9.)

(5) Duke's statement to plaintiff that she should "shut up." (*Id.* 8, 28.)

Trivial harms, petty slights, and minor annoyances are not materially adverse actions. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014). The sporadic comments allegedly directed at plaintiff, while perhaps mean-spirited and offensive, would not dissuade a reasonable person from exercising their rights under the Rehabilitation Act.

### vii. Aggregate Analysis

Whether evaluating the purportedly adverse actions individually or in the aggregate, they did not result in a materially adverse action. Plaintiff's original complaints generally arose from relatively minor interpersonal disputes with her coworkers. Supervisors and officials responding to plaintiff's complaints about these incidents granted plaintiff time off or told plaintiff to consider taking time off. While some of the alleged comments about which plaintiff complains suggest that she might not have been treated kindly at all times by colleagues in her workplace, she has not plausibly alleged that she suffered an adverse employment action for purposes of her retaliation claim under the Rehabilitation Act.[16]

---

[16] Further, as noted explicitly above with respect to a number of plaintiff's purportedly adverse actions, plaintiff has failed to plausibly allege a causal nexus between her protected activity (seeking accommodations for her purported disability) and any of the purportedly adverse actions about which she complains.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED in its entirety. Plaintiff's claims are dismissed with prejudice. The Clerk of Court is respectfully directed to serve a copy of this memorandum and order on the pro se plaintiff at her last known address, enter judgment, and close this case.

**SO ORDERED.**

Dated:    August 9, 2016
           Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States District Judge